**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**3:02CV277**

| | | |
|---|---|---|
| **BONITA GRIGGS,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **ORDER** |
| | ) | |
| **CASUAL CORNER GROUP, INC.** | ) | |
| **d/b/a PETITE SOPHISTICATE,** | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**THIS MATTER IS BEFORE THE COURT** on the "Motion for Summary Judgment"
(Document No. 24) and corresponding "Memorandum of Law in Support of Motion for Summary
Judgment" (Document No. 18), filed by Casual Corner Group, Inc. d/b/a Petite Sophisticate ("Casual
Corner"); the "Opposition to Defendant's Motion for Summary Judgment (Document No. 27), filed
by Bonita Griggs; and the"Reply Memorandum of Law" (Document No. 28), filed by Casual
Corner.[1]  Having carefully considered the parties' arguments, the record, and the applicable
authority, the undersigned will <u>grant</u> Casual Corner's motion for summary judgment, all as set forth
below.

---

[1]    The Court notes that for some reason Casual Corner's memorandum of law was filed
the day before the motion for summary judgment**.**

1

# I. FACTUAL AND PROCEDURAL BACKGROUND[2]

## A. Ms. Griggs' Initial Employment

Ms. Griggs, a Native American, was employed at the Petite Sophisticate store at the Carolina Place Mall in Pineville, North Carolina. Her employment began on March 20, 2000, and ended about ten months later on January 25, 2001. In April 2000, shortly after she was hired, she was promoted from Sales Associate to Assistant Store Manager. As an Assistant Store Manager, Ms. Griggs reported to the Store Manager.

In November 2000, Vicki Sutton became the manager of the Pineville store. Ms. Sutton reported to the District Manager, Wendy Wozniak, the individual who had initially hired Ms. Griggs. Prior to November 2000, no problems were reported with Ms. Griggs' performance, and in August 2000 she received a favorable evaluation. In addition, Ms. Griggs was one of the top producers in the Pineville store.

Shortly after Ms. Sutton became the Store Manager, however, she observed that there was a great deal of acrimony between Ms. Griggs and Cally Hunyh, the other Assistant Manager. Ms. Griggs and Ms. Hunyh were constantly complaining to Ms. Sutton about each other, and according to Ms. Hunyh, Ms. Griggs was constantly rude to her and spoke down to her. Such rude comments were repeatedly made in front of other employees as well as customers. According to Ms. Sutton, this acrimony between Ms. Griggs and Ms. Hunyh created a great deal of tension in the store and resulted in several employees threatening to quit.

---

[2] The Court notes that there a number of facts and circumstances which preceded Ms. Griggs' termination which are in dispute. Because this matter is before the Court upon Casual Corner's motion for summary judgment, the facts will be construed in the light most favorable to Ms. Griggs. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The Court notes, however, that to the extent that Casual Corner's view of the facts and circumstances factored into its decision to terminate Ms. Griggs, Casual Corner's version of these events is also relevant and will be discussed herein.

Ms. Griggs admits that there was conflict between her and Ms. Hunyh and that such conflict manifested itself on a "daily basis." She denies, however, that the situation was as bad as Ms. Sutton describes it, and points out that no employees actually quit working at the Pineville store as a result of the hostility between her and Ms. Hunyh. She also points out that Ms. Sutton testified that the ongoing dispute was one of "dual responsibility."

In addition, Ms. Griggs submitted an affidavit by Holly Epting, a part-time sales associate, who testifies that the atmosphere in the store was divided, not because of division caused by the two Assistant Managers, but because the employees did not like Ms. Sutton "who was seen as not being very compassionate." Ms. Epting also testifies that Ms. Griggs was "very professional," that Ms. Griggs was "good when it came to customer service," and that she had "good leadership skills."

## B. Ms. Griggs' Allegation Concerning a Racial Remark

During the course of her employment, Ms. Griggs discussed with her co-workers the fact that she is a member of the Catawba tribe and as such had received some settlement monies from the federal government. In December 2000, Ms. Griggs complained to Ms. Sutton that another employee had told her that Ms. Hunyh had made a derogatory remark about her Native American heritage. In particular, Ms Hunyh had allegedly told the other employee that she felt that because of their history, Native Americans, like Blacks, should receive special privileges. Ms. Griggs stated that she was offended that Ms. Hunyh had compared Native Americans to Blacks.

Ms. Sutton agreed to talk to Ms. Hunyh about the comment, which she did. Ms. Griggs testified in her deposition that she never heard any further comments from any of the employees regarding the fact that she was Native American and that the situation had been appropriately

handled. She now contends, by way of her affidavit, which was submitted along with her memorandum opposing Casual Corner's motion for summary judgment, that "additional steps needed to be taken." She does not, however, specify what steps she feels should have been taken.

Ms. Griggs also contends that she contacted Casual Corner's Human Resources Department about the allegedly derogatory comment. She contends that the person she spoke to promised to investigate, but she never heard anything further. Casual Corner has no record of any such complaint.[3]

In any event, Ms. Griggs contends that after she complained to Ms. Sutton about Ms. Hunyh's comment, their relationship "soured" and Ms. Sutton began picking on her. For example, she contends that Ms. Sutton criticized her for being tardy. Ms. Sutton states that she also counseled other employees on being late for work. Ms. Griggs also contends that Ms. Sutton began taking Ms. Hunyh's side in their ongoing dispute. Ms. Sutton, however, contends that she also counseled Ms. Hunyh regarding her poor relationship with Ms. Griggs.

### C. Ms. Griggs' Allegation of Racial Profiling

Also in December 2000, the District Manager received information that two individuals, one female and one male, both African Americans, had been in the area shoplifting and that they might attempt to return stolen merchandise to the store. Ms. Sutton informed the employees to look out for these particular individuals.

---

[3] According to the affidavit of Karen Rasmussen, Casual Corner's Manager of Associate Relations, Ms. Griggs made two telephone calls in January 2001 at which time the only complaints she made concerned the following matters: her conflict with Ms. Hunyh, as previously discussed, a request that she take a belated drug test, as discussed later, and Ms. Griggs' claim that she was assaulted by Ms. Wozniak, as also discussed later.

Ms. Griggs contends that Ms. Sutton stated that black people were more likely to shoplift and interpreted her comments to mean that they were supposed to "scope out" all blacks who might be shopping in the store. Ms. Griggs contends that she contacted Human Resources to complain about such racial profiling, but she does not recall the name of the person she talked to. There is no record of her call.[4]

### D. Ms. Griggs' Confrontation with a Customer

On December 31, 2000, an incident occurred between Ms. Griggs and a store customer in which Casual Corner contends that Ms. Griggs engaged in a shouting match with Mr. Northcutt, a customer. On the night in question, Mr. Northcutt was with his wife and infant child exchanging some clothes Mr. Northcutt had given his wife for Christmas. Teah Glenn, an African American sales associate, was assisting Ms. Northcutt.

At some point, Ms. Griggs interrupted Ms. Glenn and Ms. Northcutt and instructed Ms. Glenn to go ahead and close the store, in a manner and tone which Mr. Northcutt found offensive. Mr. Northcutt became upset and began yelling at Ms. Griggs.

Ms. Griggs denies that she spoke rudely to Ms. Glenn or that she raised her voice to Mr. Northcutt. Ms. Griggs has submitted an affidavit from Ms. Glenn in which Ms. Glenn states that she had taken "no offense to [Ms. Griggs'] orders out of respect for management." The affidavit does not address whether or not Ms. Griggs raised her voice or otherwise got into a shouting match with Mr. Northcutt.

---

[4] In her affidavit, Ms. Rasmussen, the Manager of Associate Relations, specifically denies that Ms. Griggs ever raised the issue of racial profiling.

In any event, Ms. Griggs contends that she was very frightened and upset by Mr. Northcutt's behavior, but she states that she did not report the incident to Ms. Sutton because Ms. Sutton was on vacation. Ms. Sutton, however, was subsequently informed of the incident, and she conducted an investigation which included speaking with Mr. and Ms. Northcutt and Ms. Glenn. Ms. Griggs also contends that several days after the incident, on January 2, 2001, she contacted the Human Resources Department and informed the person she spoke with that she was concerned over the lack of security because the mall security officers did not carry weapons. Again, Casual Corner does not have any record of such a complaint.

### E.  Incident Involving a Shoplifter

Meanwhile, on January 6, 2001, an incident occurred involving an alleged shoplifter. Ms. Wozniak and Ms. Sutton were sitting on a bench outside the store when an individual was observed leaving the store and putting merchandise under her blouse. Ms. Griggs, who was the manager in charge of the floor at the time, did not observe the incident. According to Ms. Wozniak, Ms. Griggs was engaged in a personal conversation with a mall security guard. Because of this, Ms. Wozniak was unable to get Ms. Griggs' attention by calling her name, so Ms. Wozniak came up to Ms. Griggs and touched her on the arm. The suspected shoplifter was never apprehended.

Ms. Griggs contends that Ms. Wozniak grabbed her by both arms and shook her while yelling at her for not noticing the suspected shoplifter.  According to Casual Corner, several days after the incident, Ms. Griggs stated to one of the sales associates that "no one touches me like that" and stated that she was going to report Ms. Wozniak.  This threat was communicated by the sales associate to Ms. Sutton.

Ms. Griggs contacted Human Resources on January 13, 2001, at which time she informed the person she spoke with that Ms. Wozniak had assaulted her. Casual Corner does have a record of Ms. Griggs' complaint, which was investigated by Ms. Rasmussen.

### F. January 12, 2001 Meeting

On January 12, 2001, the day before Ms. Griggs called Human Resources about the alleged assault, a meeting was held between Ms. Sutton and Ms. Griggs to discuss the incident with Mr. and Ms. Northcutt as well as the problems that Ms. Griggs was having with Ms. Hunyh. Ms. Sutton informed Ms. Griggs that Mr. Northcutt had thought that Ms. Griggs was being rude to Ms. Glenn because of her race.

Ms. Griggs contends that she informed Ms. Sutton that she was not prejudiced as evidenced by the fact that her boyfriend is black. Ms. Griggs contends that Ms. Sutton seemed surprised to hear this and stated that the comment had "gone right over my head".

Ms. Sutton also asked Ms. Griggs about her threat to report Ms. Wozniak for allegedly assaulting her. According to Ms. Sutton, Ms. Griggs stated that she was going to find out who was the "rat" in the store.

### G. Casual Corner's Request for Drug Test

Shortly prior to January 16, 2001, Ms. Sutton and Ms. Wozniak were informed by Lee Carpenter, a Casual Corner recruiter, that Ms. Griggs was one of several employees that had inadvertently not taken a mandatory drug test prior to her employment. In order to comply with Casual Corner's policy that all employees take such a test, Ms. Griggs was asked to take such a test on January 16, 2001. No other employee at the Pineville store was required to take a drug test at that

time, although the employees at the other stores who had been identified by Mr. Carpenter were also required to take a drug test.

Ms. Griggs contends that Ms. Sutton made humiliating remarks to her prior to the test and, in particular, stated "don't forget to save some for the test." In any event, Ms. Griggs took the drug test and passed. On January 17, 2001, she contacted Human Resources to complain about having to take the test and reiterated that she had been assaulted by Ms. Wozniak.

## H. Additional Unprofessional Conduct

Casual Corner contends that – during this same time period – Ms. Griggs also engaged in other unprofessional conduct, including complaining about her work schedule and threatening to not show up for work. Casual Corner contends that, on one occasion, Ms. Griggs threw what it describes as a "temper tantrum" over her work schedule and that the tantrum occurred in front of a customer. During the tantrum, Ms. Griggs supposedly threw a pen at Ms. Hunyh. In addition, Casual Corner contends that Ms. Griggs violated a number of Casual Corner's company policies, including its prohibition against wearing clothes without paying for them. Casual Corner also contends that Ms. Griggs impermissibly gave discounts to her family members and friends.

Ms. Griggs denies that she ever had a temper tantrum or that she threw a pen at Ms. Hunyh. She denies threatening to not show up for work and states that she never had a problem with the schedule. She also denies that she gave anyone in her family a discount without permission to do so. She admits that she wore clothes without paying for them first but contends that other employees did the same.

## I. Written Disciplinary Counseling

On or about January 19, 2001, Ms. Griggs received a written Disciplinary Counseling.[5] The Disciplinary Counseling was prepared by Ms. Sutton after consulting with Ms. Wozniak, and in a statement attached to the form, Ms. Sutton described the conduct for which Ms. Griggs was being disciplined.

The notes indicate that Ms. Griggs was being reprimanded in connection with the incident with Mr. and Ms. Northcutt and, in particular, that her conduct was unacceptable and her manner of speech was demeaning and offensive. The notes also indicate Ms. Griggs' conversations with other employees about the incident were unprofessional and lowered the morale of the store. In addition, the notes state that conversations about reporting Ms. Wozniak to the home office were also inappropriate and distracting. Finally, the notes state that Ms. Griggs was being counseled about a threat she had made not to appear for work on January 13, 2001, which was inexcusable and showed disrespect for her job and for management. At the end of the notes, it was stated that Ms. Griggs' conduct would be reviewed in thirty days and that a failure to correct the described problems would result in termination.

Ms. Griggs contends that Ms. Sutton informed her that she was being written up for "unprofessional conduct" and for complaining to Human Resources about Ms. Wozniak. Ms. Griggs received a copy of the form but contends that the copy she received did not include the attachment.

---

[5] The Court notes that the Disciplinary Counseling states that the warning is "step 2" in the process, although no previous written warnings had been issued. However, Casual Corner's progressive discipline process provides that in certain situations "a violation of Company policy or gross misconduct may be serious enough to warrant immediate written counseling (step two) or termination."

## J. Ms. Griggs' Termination and Subsequent Lawsuit

According to Casual Corner, the problems with Ms. Griggs' inappropriate attitude and behavior continued after the January 19 counseling. At that point, Ms. Griggs had worked two days since the counseling session. On January 24, 2001, less than thirty days after the counseling session, Ms. Wozniak spoke with Mel Wells, Casual Corner's Director of Employee Relations, about Ms. Griggs. Mr. Wells informed Ms. Wozniak that termination would be appropriate and, on January 25, 2001, Ms. Griggs was terminated.

On or about February 21, 2001, Ms. Griggs filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging that she had been terminated because she is Native American and also because she was dating an African American. She subsequently amended her charge on September 4, 2001, to include a claim for retaliation. On or about February 19, 2002, after concluding its internal investigation, the EEOC issued a Dismissal and Notice of Rights.

On or about May 21, 2002, Ms. Griggs commenced this action in state court alleging claims for race discrimination and retaliation in violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e ("Title VII"), the North Carolina Equal Employment Practices Act, N.C.G.S. § 143-422.1 et seq., and the public policy of the state of North Carolina. The case was subsequently removed to the Western District of North Carolina.

Discovery in the case is now complete, and on July 29, 2003, Casual Corner moved for summary judgment on all claims. Ms. Griggs has filed a response to the motion for summary

judgment and Casual Corner has filed a reply thereto. The matter is now ripe for disposition.[6]

## II. STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment should be granted when the pleadings, responses to discovery, and the record reveal that "there is no genuine issue as to any material fact and... the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); accord Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979). Once the movant has met its burden, the non-moving party must come forward with specific facts demonstrating a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

A genuine issue for trial exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). However, the party opposing summary judgment may not rest upon mere allegations or denials and, in any event, a "mere scintilla of evidence" is insufficient to overcome summary judgment. Id. at 249-50.

When considering motions for summary judgment, courts must view facts and inferences in the light most favorable to the party opposing the motion for summary judgment. Id. at 255; Miltier v. Beorn, 896 F.2d 848 (4th Cir. 1990). Indeed, summary judgment is only proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there [being] no genuine issue for trial." Matshushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)(internal quotations omitted).

---

[6] The undersigned notes that this case was previously assigned to the Honorable H. Brent McKnight and was transferred to the undersigned upon the death of Judge McKnight.

### III. DISCUSSION

### A. Title VII Claims

Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e et seq., makes it an unlawful employment practice for an employer

> to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges or employment, because of such individual's race, color, religion, sex, or national origin.

In order to prove a Title VII claim, an employee may proceed under ordinary principles of proof using direct or indirect evidence, or under the paradigm for indirect proof of employment discrimination set out in McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). See, e.g., Evans v. Technologies Applications & Service Co., 80 F.3d 954, 959 (4th Cir. 1996) (citing Goldberg v. B. Green & Co., 836 F.2d 845, 848 (4th Cir. 1988)).

To overcome a summary judgment motion based upon direct or indirect evidence of discrimination, a plaintiff "must produce direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact." Brinkley v. Harbour Recreation Club, 180 F.3d 598, 607 (4th Cir. 1999) (quoting Goldberg, 836 F.2d at 848). Accord Fuller v. Phillips, 67 F.3d 1137, 1142 (4th Cir. 1995) (to overcome summary judgment, plaintiff must provide "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision").

Under the alternative proof scheme established in McDonnell-Douglas, if the employee establishes a prima facie case of illegal discrimination (as discussed below), the burden shifts to the employer to articulate some legitimate, non-discriminatory reason for its employment decision.

**12**

McDonnell-Douglas Corp., 411 U.S. at 802. If the employer does so, the presumption "drops from the case," and the employee must demonstrate that the employer's stated reason for its action was, in fact, a pretext for improper discrimination. Id. at 804.

The Supreme Court has made it clear that the plaintiff at all times "bears the ultimate burden of proving ... intentional discrimination." Runnebaum v. NationsBank of Maryland, 123 F.3d 156, 164 (4th Cir. 1997)(en banc) (citing St.Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-11 (1993)). In Reeves v. Sanderson Plumbing Prods. Inc., however, the Supreme Court more recently held that:

> a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated. This is not to say that such a showing by the plaintiff will always be adequate to sustain a jury's finding of liability.

530 U.S. 133, 147-48 (2000)(emphasis added). Accord Rowe v. Marley Co., 233 F.3d 825, 830 (4th Cir. 2000) ("In Reeves the Supreme Court held that when a plaintiff establishes a prima facie employment discrimination case and that his employer's explanation is pretextual, this does not automatically create a jury question, but it may do so"). Nevertheless, whether Ms. Griggs is proceeding under either the direct or the indirect proof scheme, she still must present evidence from which a reasonable trier of fact could conclude that she was discriminated against in order to survive a motion for summary judgment.

Ms. Griggs contends that her termination was the result of unlawful discrimination and retaliation. Because she has presented no direct evidence of discrimination with respect to either of her claims under Title VII, she must proceed under the indirect proof scheme set forth in McDonnell-

Douglas.[7]  As explained below, she cannot establish  a genuine issue of fact with respect to either of her Title VII claims under such proof scheme.

## 1. Unlawful Termination

In order to establish a prima facie case of unlawful termination, a plaintiff must show that (1) she is a member of a protected class; (2) she was terminated; (3) she was meeting her employer's legitimate expectations; and (4) her termination occurred under circumstances that raise a reasonable inference of unlawful discrimination.  McDonnell-Douglas, 411 U.S. at 802; Rhoads v. F.D.I.C., 257 F.3d 373, 387 n.11 (4th Cir. 2001)(citing Haulbrook v. Michelin N. Am. Inc., 252 F3d 696, 702 (4th Cir. 2001)).

Although Ms. Griggs can show the first two elements of her prima facie case for wrongful termination – that she is a member of a protected class and that she was terminated – she cannot show that she was meeting her employer's legitimate expectations or that her termination occurred under circumstances that raise a reasonable inference of discrimination.  In determining whether or not an employee was meeting his employer's expectations, the Court must keep in mind that "Title VII is not a vehicle for substituting the judgment of a court for that of an employer." DeJarnette v. Corning, Inc., 133 F.3d 293, 298-99 (4th Cir. 1998) (the court "does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with discrimination") (citing Giannopoulos v. Brach & Brock Confections, Inc., 109 F.3d 406, 410 (4th Cir. 1992)).  As such, it is not the province of the Court "to decide whether the reason was wise, fair

_____

[7]  With the exception of her claim for wrongful discharge in violation of public policy in connection with the alleged assault, Ms. Griggs admits that she has no direct evidence to support her claims.

or even correct, so long as it truly was the reason for the termination." Id. (citing Giannopoulos, 109 F.3d at 410-11).

Here, the undisputed evidence shows that Ms. Griggs was failing to adequately perform many aspects of her job as an Assistant Manager: She was not exhibiting good leadership skills, not creating a positive work environment, and not providing uncompromising customer service. In fact, due to her ongoing negative attitude towards Ms. Hunyh, which was displayed in front of other employees as well as customers, Ms. Griggs was actually creating a negative work environment. In addition to not properly performing certain aspects of her job as a manager, the evidence also shows that Ms. Griggs had violated certain company policies.

In an effort to create a question of fact with respect to this issue, Ms. Griggs, while admitting that she had a conflict with her co-worker, simply denies that the problem was that severe. She also denies that she acted inappropriately either with respect to the Northcutt incident or the incident with the suspected shoplifter. Finally, Ms. Griggs denies that she violated company policy by giving her family members unauthorized discounts.

The Court notes that – to some extent – Ms. Griggs' denial concerning the severity of the conflict with Ms. Hunyh is disingenuous since she admits that she had conflicts with her co-worker on a "daily basis." In addition, although she denies violating certain company policies, she does admit that she violated Casual Corner's policy against wearing clothes without paying for them but simply states that other employees did the same thing.

More importantly, while Ms. Griggs may believe that the problems with Ms. Hunyh were not that severe, that it was appropriate to violate company policy, or that she handled the above situations appropriately, her belief concerning these matters is not enough to show that she was

adequately doing her job. Rather, "it is the perception of the decision-maker which is relevant, not the self-assessment of the plaintiff." Hawkins v. Pepsico, Inc., 203 F.3d 274, 280 (4th Cir.), cert. denied, 531 U.S. 875 (2000) (quoting Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 960-61 (4th Cir. 1996)(plaintiff's "own naked opinion, without more, is not enough to establish a prima facie case of discrimination")). Accord Goldberg v. B. Green & Co., Inc., 836 F.2d 845, 848 (4th Cir. 1988).

In addition to Ms. Griggs' own belief that she was meeting her employer's legitimate expectations, Ms. Griggs points out that prior to November 2000 she had received positive performance reviews and that she was one of the top sales producers in her store. She also submits the affidavit of one her co-workers stating that she was doing a good job.

The mere fact that Ms. Griggs may have been performing some aspects of her job in a satisfactory manner does not necessarily mean that she was performing all aspects of her job satisfactorily. In addition, for the same reason that Ms. Griggs' own opinion concerning her performance is irrelevant, evidence that one of Ms. Griggs' co-workers might have thought that Ms. Griggs was doing a good job is also irrelevant. See DeJarnette, 133 F.3d at 299 (stating "that the plaintiff's co-workers 'thought that [she] did a good job, or that [she] did not deserve to be discharged is close to irrelevant'") (citing Conkwright v. Westinghouse Elec. Corp. 933 F.2d 231, 235 (4th Cir. 1991)).

Even if the Court were to assume that this evidence created a genuine issue of material fact with respect to whether or not Ms. Griggs was adequately performing her job, Ms. Griggs has offered no evidence to show that her termination occurred under circumstances creating an inference of

discrimination. In other words, Ms. Griggs has offered no evidence that she was terminated either because she is Native American or because her boyfriend at the time was African American.

In particular, the mere fact that one of Ms. Griggs' co-workers may have made a comment about Native Americans that Ms. Griggs perceived as offensive is not evidence that Ms. Griggs was terminated because she is Native American. In so holding, the Court notes that the comment was not made by a manager or other person in authority.  By Ms. Griggs' own admission, her manager,  Ms. Sutton, dealt with the employee appropriately and no further comments about Ms. Griggs' Native American heritage were ever made by anyone.[8]

Ms. Griggs tries to argue that her termination occurred under circumstances giving rise to an inference of discrimination because she was replaced by a non-Native American, and because her termination occurred fairly soon after the comment was made.  In light of the fact that the comment was an isolated, stray remark, that it was made by a co-worker, not a manager, and was handled by management appropriately, the Court finds that this evidence does not tend to show that the reason Casual Corner terminated Ms. Griggs was because she was Native American.

Similarly, Ms. Griggs has presented no evidence that she was terminated because she was dating a man who was African American (even assuming that a cause of action for such discrimination exists). In particular, the mere fact that Ms. Sutton may have been "surprised" to hear that Ms. Griggs' boyfriend was an African American is not evidence that she was prejudiced against

---

[8]  Ms. Griggs cannot create an issue of fact by submitting an affidavit stating that she now believes that the matter was not handled appropriately. See Hernandez v. Trawler Miss Vertie Mae, Inc., 187 F.3d 432, 438 (4th Cir. 1999) (Fourth Circuit has "consistently held that a party cannot create a triable issue in opposition to summary judgment by simply contradicting his deposition testimony with a subsequent affidavit").

Ms. Griggs because of her boyfriend's race, much less that Ms. Griggs was terminated because of that fact.[9]

Finally, even assuming arguendo that Ms. Griggs could establish a prima facie case of unlawful termination (i.e, that she was terminated under circumstances giving rise to an inference of discrimination), Ms. Griggs has failed to show that Casual Corner's stated reasons for terminating her were pretextual. In order to show pretext, Ms. Griggs must show "both that the reason was false and that discrimination was the real reason for the challenged conduct." Jiminez, 57 F.3d at 377-78 quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993).

Even viewing the evidence in the light most favorable to Ms. Griggs, Ms. Griggs has failed to show that discrimination was the real reason she was terminated as opposed to the reasons given by Defendant. As previously stated, the undisputed evidence shows that Ms. Griggs was terminated for ongoing performance issues, including the ongoing personality conflict with her co-worker and her handling of the incident with the Northcutts. The record is devoid of any evidence showing that the real reason she was terminated was either because she is Native American or because her boyfriend at the time was African American.

Given such lack of evidence, Ms. Griggs attempts to show discriminatory motive by arguing that she was treated differently than other employees at her store. In particular, she contends that other employees were not similarly disciplined for similar misconduct, and that she was singled out to take a drug test. The evidence, however, simply does not support this argument.

---

[9]  The Court notes that there is no evidence that Ms. Wozniak, the other decision-maker, even knew that Ms. Griggs' boyfriend was African American, and the evidence shows that she was not informed of this fact until after the lawsuit was filed.

In particular, the evidence shows that other employees, including Ms. Hunyh, were also counseled for inappropriate behavior. In addition, the evidence shows that Ms. Griggs was asked to take a drug test because a random check of the records by the person in charge of such matters revealed that she had failed to do so when she started her employment, not because she was being singled out or discriminated against.

In short, Ms. Griggs cannot show that Casual Corner's reasons for terminating her were pretextual, that is, that the reasons were in any way related to either her or her boyfriend's race. Ms. Griggs' mere speculation or opinion that her and/or her boyfriend's race played a role in Casual Corner's decision is simply not enough to carry her burden of proving that she was the victim of intentional discrimination. See, e.g., Runnebaum, 123 F.3d at 175 (summary judgment affirmed where plaintiff failed to rebut employer's claim that the plaintiff was terminated for failure to fulfill his sales goals and for failure to amend his professional conduct); Ennis, 53 F.3d at 61 ("Mere unsupported speculation" that the discharge was based on discrimination "is not enough to defeat a summary judgment motion").

In light of Ms. Griggs' inability to establish a prima facie case of unlawful termination, or to show that Casual Corner's stated reasons for terminating her were pretextual, the Court will grant Defendant's motion for summary judgment on this claim.

## 2. Retaliation

In addition to prohibiting discrimination in the workplace on the basis of sex, race, religion, or gender, Title VII of the Civil Rights Act of 1964 prohibits employers from retaliating against employees who attempt to enforce their rights under the Act. 42 U.S.C. 2000e-3(a).

To establish a prima facie case of retaliation in violation of Title VII, an employee must show that (1) the employee engaged in protected activity; (2) the employer took some adverse employment action against the employee; and (3) a sufficient causal connection existed between the protected activity and the adverse action. McNairn v. Sullivan, 929 F.2d 974, 980 (4th Cir. 1991) (citing Ross v. Communications Satellite Corp., 759 F.2d 355, 365 (4th Cir. 1985)), abrogated in part on other grounds by Price Waterhouse v. Hopkins, 490 U.S. 228 (1989). See also Hopkins v. Baltimore Gas and Ele. Co., 77 F.3d 745, 754 (4th Cir. 1996); Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir. 1989).

Here, Ms. Griggs alleges that Ms. Sutton and Ms. Wozniak retaliated against her for reporting that her co-worker had made a racially derogatory remark and for reporting that the store was engaging in racial profiling. As an initial matter, the Court agrees with Ms. Griggs that these complaints would constitute protected activity under Title VII. The Court notes, however, that there is no evidence – other than Ms. Griggs' own testimony – that Ms. Griggs actually reported these particular activities to Casual Corner's Human Resources Department. According to Ms. Rasmussen, such complaints were never made.

Assuming for the sake of this motion for summary judgment, however, that Ms. Griggs reported such conduct to Human Resources, she must also show that there is a causal connection between the making of the report and her subsequent termination. In order to show a causal connection between the protected activity and the adverse action, an employee must show that the action would not have been taken "but for" her engaging in such activity. Ross, 759 F.2d at 365. "The 'but for' test serves the salutary function of directing the factfinder's attention to the predominant reason for an employer's adverse actions." Id.

Applying the above test and viewing the evidence in the light most favorable to Ms. Griggs, Ms. Griggs has failed to present any substantive evidence that "but for" her reporting these activities to Human Resources she would not have been terminated. Rather, the evidence shows that the reason she was terminated was that she was not performing her job satisfactorily due to problems both with her co-workers and with customers. In light of such evidence, Ms. Griggs cannot establish the requisite causal connection between the protected activity and her termination. See, e.g., Hopkins, 77 F.3d at 754-55 (employee could not show that adverse employment action was taken because of his sexual harassment complaints where there were problems with his job behavior and work relations).

Ms. Griggs contends that the Court should nevertheless presume the existence of a causal relationship due to the fairly short period of time between the making of the complaints and her termination. Such a relatively short period of time may, in certain circumstances, give rise to an inference that there is a causal relationship between the two events. See, e.g., King, 328 F.3d at 151 (where firing occurred two weeks after the employer received notice of employee's EEOC claim, Fourth Circuit held that such timing, although "far from conclusively establishing the requisite causal connection" nevertheless "gives rise to a sufficient inference of causation to satisfy the prima facie requirement").

Even if the Court were to assume the existence of such a causal relationship between the alleged reports and Ms. Griggs' termination, however, Casual Corner has presented legitimate, non-discriminatory reasons for terminating Ms. Griggs – namely the fact that there were serious problems with her job performance. Further, Ms. Griggs has failed to show that such reasons are a pretext.

In order to show that Casual Corner's stated reasons are a pretext, Ms. Griggs must show that her complaints were the "motivating factor" in the decision to terminated her. <u>McNairn</u>, 929 F.2d at 974. Ms. Griggs has presented no evidence that the motivating factor in Casual Corner's decision to terminate her were these complaints. Indeed the undisputed evidence shows that she was terminated due to an on-going pattern of unprofessional conduct and lack of leadership skills. Therefore, Ms. Griggs has failed to raise a question of fact with respect to this issue. As stated by the Fourth Circuit in <u>Ross</u>, Title VII does not shield employees from "normal sanctions for misconduct," nor does it give them "a stranglehold on a job" simply because they have engaged in some activity protected by the Act. <u>Ross</u>, 759 F.2d 365.

In summary, Ms. Griggs cannot establish a prima facie case of retaliation in connection with reporting the alleged derogatory remark or the alleged racial profiling, and even if she could do so, she cannot show that the stated reasons for her discharge were a pretext. Accordingly, the Court will also grant summary judgment on Ms. Griggs' retaliation claims.

## B. Discrimination in Violation of the NCEEPA

Casual Corner contends that – because the NCEEPA does not create a private cause of action – Ms. Griggs' claim for wrongful discharge in violation of the Act is essentially a claim for wrongful discharge in violation of public policy.[10] Casual Corner further contends that Ms. Griggs'

---

[10]    The NCEEPA provides in part:

> [i]t is the public policy of this State to protect and safeguard the right and opportunity of all persons to seek, obtain, and hold employment without discrimination or abridgement on account of race, religion,

claim for wrongful discharge in violation of the public policy set forth in the NCEEPA should be dismissed on the grounds that such claims are evaluated under the same test set forth in <u>McDonnell-Douglass</u>. <u>See</u> <u>Hughes v. Bledsoe</u>, 48 F.3d 1376, 1383 (4ᵗʰ Cir. 1995)("Given the similar language and underlying policy of § 143- 422.2 and Title VII, 42 U.S.C. § 2000e et. seq., the North Carolina Supreme Court has explicitly adopted the Title VII evidentiary standards in evaluating a state claim under § 143- 422.2..."). In her memorandum opposing Casual Corner's motion for summary judgment, Ms. Griggs concedes that this a correct assessment of the law.

Accordingly, for the same reasons that Ms. Griggs' Title VII claims are being dismissed, namely the lack of any direct or indirect evidence of discrimination, the Court must also grant summary judgment on Ms. Griggs' claim for unlawful discrimination in violation of the NCEEPA.[11]

### C. Wrongful Discharge in Violation of Public Policy

The public policy exception to the employment at will doctrine is a very narrow one. <u>See</u> <u>Brackett v. SGL Carbon Corp.</u>, 580 S.E.2d 757 (2003); <u>Considine v. Compass Group USA, Inc.</u>, 551 S.E.2d 179 (2001); <u>Garner v. Rentenbach Constructors Inc.</u>, 515 S.E.2d 438 (1999); <u>Kurtzman v. Applied Analytical Industries, Inc.</u>, 493 S.E.2d 420, 423 (1997); <u>Amos v. Oakdale Knitting Co.</u>, 416 S.E.2d 166 (1992); <u>Percell v. International Business Machines, Inc.</u>, 765 F.Supp. 297 (E.D.N.C.

---

color, national origin, age, sex, or handicap by employers with 15 or more employees.

N.C. Gen. Stat. § 143-422.2.

[11] The Court notes that the NCEEPA does not include a claim for discharge in retaliation for complaining about discriminatory practices since the Act does not express any public policy concerning retaliation. <u>See e.g.</u>, <u>Mullis v. Mechanics and Farmers Bank</u>, 994 F.Supp. 680, 688 (M.D.N.C. 1997). Therefore, Ms. Griggs' retaliatory discharge claim under the NCEEPA fails for this reason as well.

1991); Coman v. Thomas Mfg. Co., 381 S.E.2d 445 (1989). "In order to support a claim for wrongful discharge of an at-will employee, the termination itself must be motivated by an unlawful reason or purpose that is against public policy." Considine, 551 S.E.2d at 183. "Any exception to the employment at will doctrine 'should be adopted only with substantial justification grounded in compelling considerations of public policy.'" Id. at 184 citing Kurtzman, 493 S.E.2d at 423.

In order to establish a claim for wrongful discharge in violation of public policy, the employee must demonstrate that the defendant's conduct violated an explicit statutory or constitutional provision, or that the employer encouraged the employee to violate a law that would result in harm to the public, thereby violating public policy. Id. at 184. As stated by the District Court in Percell:

> The common thread running through all cases under North Carolina law which have allowed claims for wrongful discharge in violation of public policy is a desire to prevent employees from being faced with a choice between committing an act which is harmful to the public interest or losing their jobs.

765 F.Supp. at 301; see, e.g., Coman, supra, (discharging an employee for refusing to falsify driver records to show compliance with federal transportation regulations offends public policy); Amos, supra, (employee discharged for refusing to work for less than minimum wage violates public policy); Brackett, supra, (public policy violated when employee discharged for asserting his rights under the Worker's Compensation Act).

Here, Ms. Griggs contends that she was terminated in violation of public policy because assault and battery is a misdemeanor under North Carolina law. See N.C.G.S. § 14-33(a). In addition,

Ms. Griggs contends that public policy concerns were implicated when she was terminated because assault and battery is an actionable tort under civil law.[12]

While Ms. Griggs is able to articulate a statute that her supervisor allegedly violated, Ms. Griggs' subsequent termination did not violate this statute, nor did her termination violate any public policy set forth in this statute. In other words, neither the statute criminalizing assault, nor the laws creating civil liability for assault, express any public policy concerning retaliation against someone who reports such acts. Therefore, Casual Corner's alleged actions in this case – while certainly not condoned by the Court – do not implicate any public interest.[13]

In so holding, the Court notes that Ms. Griggs has provided no authority for the proposition that an employee's discharge for reporting a possible violation of a criminal statute would fall within the public policy exception to the employment at will doctrine. Likewise, Ms. Griggs has not provided any authority for the proposition that an employee's discharge for reporting an act which might give rise to civil liability would fall within the public policy exception. Rather, she merely states that there is "no reason to exclude" such a cause of action under the public policy exception.

A review of the cases addressing the public policy exception, however, reveals that the North Carolina state courts have never held that the public policy exception applies in such circumstances.

---

[12]   The Court notes that although Casual Corner disagrees that Ms. Wozniak actually assaulted Ms. Griggs, and there is no evidence to support her contention, it is assumed for the sake of this motion that the incident occurred as Ms. Griggs described it.

[13]   In so holding, the Court notes as previously stated, that the NCEEPA does not express any public policy concerning retaliation and the courts have declined to read such concerns into the statute.

Therefore, such a holding would be a broad and unprecedented expansion of the public policy exception resulting in the erosion of the employment at will doctrine.

Accordingly, the Court will grant Casual Corner's motion for summary judgment with respect to Ms. Griggs' claim for wrongful discharge in violation of public policy.

## V. ORDER

**IT IS, THEREFORE, ORDERED** that Casual Corner's "Motion for Summary Judgment" (Document No. 24) is **GRANTED,** the Complaint is **DISMISSED WITH PREJUDICE,** and the parties shall bear their own costs.

Signed: August 10, 2005

David C. Keesler
United States Magistrate Judge